# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# SPARTANBURG DIVISION

| | |
|---|---|
| Brandy Austin, individually as mother and natural guardian of Christa B. Austin, a minor, | )<br>)<br>)<br>) |
| Plaintiffs, | ) C.A. No. 7:09-cv-03320-JMC<br>) |
| v. | ) **OPINION AND ORDER**<br>) |
| Nestle USA, Inc., | )<br>) |
| Defendant. | )<br>) |

This matter is before the court on Plaintiffs' Motion to Compel Disclosure of Discovery ("First Motion to Compel") [Entry # 54] pursuant to Rule 37(a) of the Federal Rules of Civil Procedure. A hearing convened before the court on this motion and Plaintiff's Motion to Compel Disclosure of Discovery (II) ("Second Motion to Compel") [Entry # 72] on September 16, 2010.[1] For the reasons stated herein, Plaintiffs' motion is granted in part and denied in part.

## FACTUAL AND PROCEDURAL HISTORY

This is a products liability action in which Plaintiffs allege that Defendant's Good Start Supreme® powdered formula caused the minor Plaintiff to contract meningitis and sustain severe injuries after she consumed the bacteria *Enterobacter sakazakii* ("*E. sakazakii*") found in the product. Plaintiffs initially filed this action in state court in Minnesota, alleging causes of action for strict liability, negligence, failure to warn, and breach of warranty. On September 29, 2009, Defendant removed the case to the District Court for the District of Minnesota. That court then

---

[1]This Order does not concern Plaintiff's Second Motion to Compel. The court will address the discovery issues contained in that motion in a separate Order.

1

granted Defendant's motion to transfer the case to the District of South Carolina. On June 7, 2010, Plaintiffs filed their First Motion to Compel seeking to compel Defendant to fully respond to its Interrogatories and Requests for Production. Specifically, Plaintiffs move the court for findings and determinations that: (1) Defendant's history of testing and the testing results for the bacteria *E. sakazakii* are discoverable with respect to Defendant's raw materials, manufacturing facilities, and finished products; (2) all documents concerning labeling are discoverable, and ordering Defendant to answer Interrogatory 19 and produce all documents in response to requests for documents 16 and 17; (3) Defendant's discovery responses and deposition transcripts in a previous case involving similar facts, *Cox v. Nestle USA, Inc.* (M.D. Tenn), are discoverable in the manner requested in document requests 4 and 5; and (4) Defendant be compelled to answer Interrogatory 10.

## LEGAL STANDARD

The Federal Rules of Civil Procedure provide that a party may "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense- including the existence, description, nature, custody, condition and location of any books, documents or other tangible things and the identity and location of persons who know of any discoverable matters." Fed. R. Civ. P. 26(b)(1). "Relevant information need not be admissible at trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* If a party fails to answer an interrogatory submitted pursuant to Rule 33 of the Federal Rules of Civil Procedure or fails to produce a requested document, "a party seeking discovery may move for an order compelling an answer, designation, production, or inspection." Fed. R. Civ. P. 37(a)(3).

**DISCUSSION**

**A. Nestle Testing History**

Plaintiffs request the court to compel Defendant to answer all interrogatories and provide "all documents" relating to testing that it or others conducted regarding *E. sakazakii* with respect to Defendant's raw materials, manufacturing facilities and finished products from February 7, 1996 to present and all *E. sakazakii* isolates ever obtained by Defendant and any genetic testing performed on them. (Interrogatory 3; Requests for Documents 7 and 11). Defendant initially responded by providing Plaintiffs with information and documents regarding the production and microbiological testing of the Good Start Supreme® formula lot[2] in question. However, Defendant objected to producing additional testing results, deeming the request overbroad. Furthermore, Defendant stated that it only tests the finished product. Defendant maintains that it appropriately responded to Plaintiffs' discovery requests.

To date, Defendant has provided documents and testing relating to the ten lots produced before and after the lot in question from their the Eau Claire, Wisconsin facility, including material explaining its microbiological program for controlling *E. sakazakii* in its manufacturing plant. Plaintiffs, however, contend that this response is not reasonable, and the court should require Defendant to comply with the initial discovery requests. The court inquired about the time period covered by Defendant's tests for the ten lots on either side of the lot in question, and Defendant responded generally that there is no specific time period that corresponds with the production of a

---

[2] In essence, a "lot" is a very large production batch consisting of a specified amount of powdered formula manufactured in the same facility during a specific time period.

3

lot, but that the twenty lots offered corresponds with approximately one to two weeks of production on either side of the lot in question.

At the hearing, Plaintiffs agreed to restrict their request to testing of the Good Start Supreme® powdered formula lots produced at the Eau Claire production facility during the seven year period prior to the production of the lot at issue in this case up until the present. According to Plaintiff, this seven year period reflects the life-span of the bacteria. Plaintiffs support this contention with expert affidavits. Specifically, one of Plaintiffs' proposed experts avers that a colony of the bacteria can survive in a facility for at least seven years or more, and Plaintiff is attempting to prove that a seven-year-old colony could have contaminated the formula consumed by the minor Plaintiff. Defendant argues that Plaintiffs' suggested seven year time period constitutes "junk science," but it has not provided sufficient reasons to exclude all testing within seven years of the lot in question at this stage in the discovery process.

The court finds that the requested information is relevant to Plaintiffs' failure to warn claim and the sufficiency of Defendant's efforts to combat the bacteria at its Eau Claire plant. Plaintiffs' experts, in their affidavits, have averred the following, making such testing information at least discoverable in support of Plaintiffs' claims: the distribution of the bacteria in the various lots is uneven, and contamination can vary from lot to lot or area to area of a specific lot (Farmer Aff. ¶ 15); there is a possibility that lots not contaminated were discarded and contaminated lots were not discarded (Farmer Aff. ¶ 15); it is not likely that there would be homogenous distribution of the bacteria in a single lot and there is no data that describes the distribution of the bacteria within a single lot (Farmer Aff. ¶ 16); if a lot has been contaminated, testing should be performed on all of the other lots because the bacteria would not necessarily be contained to the single lot or to a specific

area of one lot (Farmer Aff. ¶ 17); the distribution of the bacteria within powdered formula is not always consistent from lot to lot - it could be clumped together or broken up depending on the lot, and depending on each individual package of formula sold (Farmer Aff. ¶ 18); the data indicates that a testing showing a negative presence of the bacteria for a particular sample does not mean that other samples from the same lot would be negative (Farmer Aff. ¶ 20); to establish causation, the product must be traced through its complete history, including the records concerning the production environment (Farmer Aff. ¶ 23); contamination can extend over a long period of time (Farmer Aff. ¶ 14); cross-contamination can occur between products manufactured and packaged at the same facility (Becker Aff. ¶ 6); most infections follow the initial ingestion of the powdered formula (Becker Aff. ¶ 8); only a fraction of a particular lot is usually tested for the bacteria (Becker Aff. ¶ 11); industry testing is inadequate to rule out the presence of the bacteria entirely (Becker Aff. ¶ 12); the best method to determine the source of the minor Plaintiff's injuries in this case would be DNA matching of the clinical isolate to one found in the Defendant's plant (Donnelly Aff. ¶ 6); the bacteria can survive at least up to seven years in a manufacturing environment, particularly in powdered infant formula factories because of their wet/dry climate (Donnelly Aff. ¶ 7); and neonatal meningitis is only associated with *E. sakazakii* found in powdered infant formula (Donnelly Aff. ¶ 20). All of this information is relevant to whether formula produced by Defendant at the Eau Claire plant caused the minor Plaintiff's injuries and could lead to admissible evidence in this case.

In addition, Defendant does not object to producing the lots that tested positive for *E. sakazakii* from January 1, 2002 to the date of the complaint. The court sees no reason why Defendant should not also submit the documents related to the testing for the lots that tested negative for traces of the bacteria, even though Defendant speculates that this information could be used in future

5

litigation. At the hearing, counsel for Defendant stated that this information is readily available in an accessible format. Therefore, the court now finds that Defendant shall produce all documents relating to the testing for all the lots produced from January 1, 2002 until the filing of the Complaint in this case, including lots that tested positive and negative for traces of the *E. sakazakii* bacteria. The data shall be limited to Nestle's Good Start Supreme® powdered formula which was produced at the Eau Claire plant.

Finally, as to Plaintiffs' request for the testing of all *E. sakazakii* isolates ever obtained by Defendant and any genetic testing performed on them, Defendant informed Plaintiffs and the court that Defendant has not performed PFGE analysis on any *E. sakazakii* isolates from its Eau Claire facility. Therefore, because such information does not appear to be available, the court finds that Defendant has appropriately responded to this discovery request.

**B. Labeling**

Plaintiffs request the court to require Defendant to relinquish "all documents" concerning powdered infant formula labels it has used in the United States and foreign countries since January 1, 1998, including directions, instructions and warnings associated with *E. sakazakii*. The requests included, but were not limited to, labeling about "bacterium contamination" and warnings that the product is not suitable for infants who are immunocompromised. (Interrogatory 19; Requests for Documents 16 and 17).

Plaintiffs believe that the European label is different, contains another type of warning than its American counterpart, and believe that they are entitled to question Defendant about any potential discrepancies between the European labels and those used on Defendant's American products. Defendant objected to the response on the grounds that such request is overly broad in scope and

provided a copy of the Good Start Supreme® label in question, as well as the label that is currently in use, and identified the person most knowledgeable about labeling at Defendant's company to facilitate discovery on this subject. At the hearing, counsel for Plaintiffs stated that he would limit his request to the European labels on Nestle products. However, Defendant's counsel has informed the court that Defendant (Nestle USA, Inc.) has no role in the manufacture or labeling of Nestle products in Europe, and therefore, would be unable to provide the requested labels, as they are not in Defendant's custody or control. Rather, Defendant only produces products and labeling for powdered formula for North America and the Carribean and has produced these labels to Plaintiffs. Therefore, Plaintiffs' request as to labeling materials for Nestle products abroad is denied, and the court deems Defendant's original responses to these discovery requests appropriate and satisfactory.

### C. Discovery Produced in *Cox. v. Nestle*

Plaintiffs also request that the court compel Defendant to disclose discovery materials (including written discovery, deposition transcripts, and exhibits) produced in a similar case litigated in Tennessee involving *E. sakazakii* meningitis in a minor child, *Cox v. Nestle*. (Document Requests 3 and 4). In response, Defendant objected to these requests on the grounds that they are overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Moreover, Defendant informed the court that much of the requested discovery is subject to a protective order in the previous case. In addition, Defendant's counsel is concerned that Plaintiffs' attorneys in this case may share the *Cox* discovery with other attorneys involved in similar *E. sakazakii* litigation in violation of the confidentiality order and that this discovery could then be the source of a fishing investigation to initiate future litigation against Defendant. However, Defendant's fears are unfounded as the attorneys of record in this case are parties to a similar protective order as

in *Cox*. However, the court agrees with Defendant that Plaintiff should not have unfettered access to all of the *Cox* discovery, as there is no indication that such discovery is relevant to this case.

Therefore, as discussed at the hearing, Defendant shall produce the deposition transcripts of witnesses who will be deposed in this case subject to the parties' confidentiality agreement. As stated by the court in *Snowden v. Cannaught Laboratories, Inc.*, 137 F.R.D. 325, 330 (D. Kan. 1991), when that court was presented with similar arguments, "such information could save the time and expense of duplicating discovery aimed at the same issues and materials already produced in prior litigation." Additionally, under the Federal Rules of Evidence, Plaintiffs are entitled to explore prior statements of witnesses. *See* F.R.E. 613. The court reminds Plaintiffs that they should make every effort to use this previous testimony to shorten and expedite their own depositions of these witnesses. Furthermore, this discovery is subject to the parties' consent confidentiality agreement.

### D. Other Causes

Plaintiffs also seek an Order compelling Defendant to respond to Interrogatory 10: "Identify all known cases of neonatal *E. sakazakii* meningitis not associated with powdered infant formula." Defendant objected and deferred answering this Interrogatory on the basis that it asked for expert opinions and work product, and because this information was readily available to Plaintiffs in medical literature to the same extent as Defendant. At the hearing, the parties informed the court that Plaintiffs no longer sought the court to resolve this issue because Defendant admits that powdered formula is *a* cause of *E. sakazakii*, but not the only cause. Therefore, the court makes no ruling on this issue.

## CONCLUSION

Upon consideration of the Plaintiffs' motion, and opposition thereto, and the record herein, the court hereby orders that Plaintiffs' motion is granted in part and denied in part as stated below:

1. The court finds and determines that Defendant shall relinquish to Plaintiffs documents related to testing of lots produced from January 1, 2002 through the filing of the Complaint. The test results should include the lots that tested positive for traces of *E. sakazakii* as well as the lots that tested negative for the bacteria during this period. The testing information shall be limited to lots produced at Defendant's Eau Claire facility and the Nestle Good Start Supreme® product.

2. The court finds and determines that Plaintiffs' request for Nestle's European labels is denied.

3. The court finds and determines that Plaintiffs' request for Defendant to relinquish the discovery from *Cox v. Nestle*, is granted, but is limited to deposition transcripts of witnesses who will be deposed in this case.

4. The court makes no determination regarding Plaintiffs' request that Defendant admit that its product causes *E. sakazakii* meningitis, as the parties resolved this aspect of Plaintiffs' motion prior to the hearing.

Defendant shall provide supplemental responses to Plaintiffs' discovery requests within thirty (30) days from the date of this Order. The discovery deadline of October 1, 2010 shall be extended for sixty (60) days from the date of Defendant's compliance with this Order so that the parties may conduct further discovery and take depositions.

**IT IS SO ORDERED**.

                                                s/ J. Michelle Childs
                                                United States District Judge

October 26, 2010
Greenville, South Carolina